UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY MARTINEZ,

      Plaintiff,                                     Case No. 10-13271

CRACKER BARREL OLD                        HON. AVERN COHN
COUNTRY STORE, INC.,

      Defendant.
_____/

## MEMORANDUM AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 9)

### I. Introduction

This is an employment case claiming reverse discrimination under 42 U.S.C. § 1981 and under the Michigan Elliot-Larsen Civil Rights Act (ELCRA), MCL 37.2101 et seq.  Plaintiff Mary Martinez (Martinez), a Caucasian female, sued her former employer, defendant Cracker Barrel Old Country Store (Cracker Barrel), claiming discrimination based upon race and retaliation for reporting sexual harassment and race discrimination.  Martinez subsequently dropped her retaliation claim.  Thus, only Martinez's reverse race discrimination claim is at issue.

Before the Court is Cracker Barrel's motion for summary judgment[1] on the grounds that:  (1) Martinez has failed to make out a prima facie case of race discrimination because she has failed to show that race was a factor in her termination or that similarly situated African-American employees received more favorable

---

[1]Neither party fully compiled with the Court's motion practice guidelines for a motion for summary judgment.  The parties did not file a joint statement of material facts in dispute. However, Cracker Barrel's brief contains a statement of material facts in paragraph form.  Martinez's response brief contains responses to those material facts in the same paragraph form.  Cracker Barrel did not highlight its exhibits; Martinez did.  Be that as it may, the record is sufficiently complete to enable a decision on the motion.

treatment; (2) Cracker Barrel had a legitimate non-discriminatory reason for Martinez's termination and Martinez cannot show that to be a pretext for illegal discrimination.

For the reasons that follow, the motion will be granted.

## II. Background

### A. Martinez's Employment at Cracker Barrel

Martinez began her last period of employment with Cracker Barrel in 2000. Martinez previously worked for Cracker Barrel between 1995 and mid-1999. During that time she worked as a cashier, gift shop worker, and shop assistant and she was promoted several times. Martinez voluntarily took leave for several months. She was rehired in 2000 as retail manager at the Cracker Barrel facility in Flint, Michigan. She retained this position until February 11, 2010. The duties of a retail manager are to participate in the hiring of the retail workers and cashiers, supervise the retail workers and cashiers, and ensure that the overall execution of the business is consistent with company standards. There is no dispute that Martinez was qualified for the job.

When Martinez applied for a position with Cracker Barrel in 1999, she was made aware of Cracker Barrel's company rules which prohibit discriminatory activity or inappropriate conduct by its employees. Further, the company rules mandated that any discriminatory activity be reported immediately through an Employee Relations hotline. Martinez was given an Employee Handbook which reviewed Cracker Barrel's conduct rules, their open door policy, and their commitment to equal opportunity employment.

Martinez was given training on discrimination and harassment, including training from the Department of Justice. During this training program, the term "ghetto" was raised, and Martinez agrees that she was made aware that it is a racially-charged term. Martinez additionally signed a Cracker Barrel Employee Awareness Form which listed the rules of behavior for employees. Martinez acknowledges that she understood that Cracker Barrel's company rules were binding on her and that failure to comply may lead to discipline, up to and including termination.

B. The Incident and The Investigation

An incident occurred on January 25, 2010 which led to a complaint about Martinez's behavior.  An assistant manager, Matthew Cunningham, started a discussion with Martinez about the Haiti earthquake.  He mentioned that his friend on Facebook was upset that the United States Government was sending money to Haiti when there were so many people in the United States who needed aid.  Martinez agreed that this could be upsetting.  Two dishwashers, Sylvester Hatten and Andre Green, joined the conversation.[2]  Sylvester said that the people in Haiti had no choice with regard to what happened to them and therefore needed the aid.  Martinez disagreed and said that the people in Haiti did have a choice; they chose to live in Haiti.  Had they wanted a better a life, she explained, they could have achieved it by coming to the United States.  Sylvester insisted that the people in Haiti did not have a choice and that, much like them, he did not have the choice "to be better."  For instance, he said he wanted to be a general manager but felt it was beyond him.  Martinez responded that if he went to school and made his way up the ranks, maybe he would achieve the level of general manager.  Sylvester said that he was not the type to go to school.

Cook, an employee, had overheard the conversation and heard Martinez talking about the Bridge Card.[3]  Thus, when Martinez came into the wait area, Cook said that she had a Bridge Card and loved it.  Cook added that she works full-time and goes to school full-time and is not ashamed to get a little extra help.  Martinez responded that "maybe you are living above your means."  Martinez insisted further that she never resorted to the Bridge Card and she was proud of it.  Cook attempted to explain her circumstances and how they might differ from Martinez's but Martinez remained unconvinced.  Cook concluded that "I felt the way she approached me was very wrong and disrespectful.  She made it very clear that she did not approve of my life style and I

[2]Hatten and Green are African-Americans.

[3]The Michigan Bridge Card is a debit card which qualifying individuals can use to purchase food products and access cash benefits.

don't think it was called for." (Cracker Barrel's Exhibit S).[4]

An Associate Manager, Kim Masker (Masker), overheard what Cracker Barrel describes as a "heated conversation"[5] in the kitchen.  Masker made a formal complaint to General Manager Don Longest (Longest) on January 28, 2010.  Her complaint alleges that Martinez had said:  "The people in Haiti choose that life, choose to be poor, and should get on a boat and paddle to America."  Hatten and Green remember similar language but Martinez claims that she never said "paddle to America."  Otherwise, Martinez does not dispute that this conversation occurred or what she contributed to it; she claims, however, that all four employees had participated and yet she alone was singled out for punishment.

Longest subsequently filed an incident report.  When this incident came to the attention of District Manager Joanne Morris (Morris), she wrote an email to Employee Relations Specialist Tonyia Jones (Jones) on Feb. 1, 2010, describing the incident.  She added:  "I am not sure if Mary mentioned race.  These employees though seemed to feel that she was putting their race down. […] Needless to say, we have a lot of upset people, and …feel we need to react very quickly."  (Martinez's Exhibit 18).

Jones works in Cracker Barrel's home office in Lebanon, Tennessee.  Her duties include general human relations (HR) guidance and conducting investigations.  Jones opened the investigation on Martinez on February 3, 2010.[6]

In the course of the investigation, several other employees stated that Martinez

---

[4]Martinez describes this conversation in her brief as follows: "At this point, Mary had a conversation with Katie about public assistance and whether she needed it since she was a full time employee."

[5]Martinez contests that the conversation was "heated."  She explains that the parties were speaking loudly not because the conversation was "heated" but because she was in the prep area while the dishwashers were in the kitchen which is some distance away.

[6]The investigation report is Martinez's Exhibit 16.  It begins on page 14/18 and works its way backwards from there.  Thus, page 13/18 is the second page of the investigation report, page 12/18 is the third page, and so forth.

had made inappropriate racial comments in the past.  Shamara Ezell claimed that Martinez made inappropriate comments about the Bridge Card and lifestyle choices.  She recalled an incident when she mentioned to Martinez that she was getting a Bridge Card.  Martinez advised her not to and said, "don't you want to live the American Dream?"  (Martinez's Exhibit 16, p. 11).  Dishonna Hall stated that Martinez shared her personal feelings about teen pregnancy.  Specifically, Martinez had asked her, "how many kids she had, how she takes care of them, and who keeps them for her."  (Id. at p. 12).  Jamia Murray claimed that she heard Martinez making comments about the "ghetto card" and "ghetto Ebonics" several times.  Murray said that Martinez occasionally corrected employees on their language and advised them to refrain from using slang.  Further, Murray recalled a Friday when Martinez refused to hand out paychecks to the employees.  Apparently, the employees had discussed their Bridge Cards on the previous day and Martinez was upset about their reliance on the cards.  Sharondra Smith (Missy) corroborated what the other employees had said about the use of the term "ghetto bridge card" and the day that Martinez had failed to give out the paychecks.  Missy, however, stated that Martinez's comments were not racial and did not offend her.  However, she added that Martinez could be hard on people who were not her favorites.

Martinez admits using the term "ghetto Bridge Card," occasionally getting into conversations with other employees about their lives, and occasionally correcting the language of employees, but she denies using the term "ghetto Ebonics."

During the course of the investigation, Morris and Restaurant District Manger Nick Beedie (Beedie) went to the Flint store where Martinez worked to interview her.  When Martinez asked whether she was going to be fired, she alleges that Beedie answered:  "[W]e'll both go to bat for you, but you have to remember that this is Flint and you know the history of this store." (Cracker Barrel's Exhibit G, p. 84).  Martinez never asked Beedie what he was referring to but she speculates in her deposition that he was making reference to a previous incident when a Caucasian manager, Patty,

called the police after her African-American guests told her that they did not intend to pay for their meal.  The guests later complained and Patty was fired for offending them.

In the course of the Martinez investigation, it became apparent that other retail employees,[7] not managers, used inappropriate terms, including the term ghetto card. They were given policy reviews.  Jones explained, from an HR perceptive, there is a difference between managers and employees; the managers hold positions of leadership and therefore "are held to a higher standard." (Cracker Barrel's Exhibit T, p. 104).

### C.  Martinez's Termination and Her Subsequent Actions

#### 1.

When the investigation was completed it was determined that Martinez had violated the company rules and would be terminated.  There is some dispute among the employees of Cracker Barrel regarding who made this final determination.  Jones recommended the termination and Morris signed the discharge document and communicated the termination decision to Martinez.  Both employees, however, insist that they did not actually make the decision.[8]  Jones and Morris are Caucasion, as is Longest.

At some point after the investigation was completed Martinez was invited to a meeting.  Martinez stated at the meeting that if the intent was to terminate her employment, she would rather have it done over the phone.  As such, on February 12, 2010, Morris read the document titled "Employee Counseling Report" to Martinez via speaker phone.  Beedie was present as a witness.  The document reads as follows:

> Allegations were brought forth that your behavior in the workplace could
> be perceived as inappropriate or unprofessional in nature.  Specifically, it

---

[7]These employees were African-American.

[8]In her deposition Morris  said that she was not involved in the decision to terminate Martinez's employment but was instructed to do from someone in the Employee Relations Department in the home office in Tennessee.  She says that the main decision-maker was Tonyia Jones.  Jones, however, insists that she merely offered a recommendation and that Morris, or Morris' supervisor, made the final decision.

was alleged that you: (1) Participated in a heated conversation with two employees, sharing your personal views and insensitive comments about the people in Haiti. (2) It was alleged that you referred to a state assistance program (Bridge Card) as a Ghetto Card. (3) It was alleged that you shared your personal views and made derogatory comments to employees about receiving state assistance.  As a result of a thorough investigation, these claims have been substantiated.

(Cracker Barrel's Exhibit N)

The Counseling Report concluded that Martinez had violated two company rules of conduct and her employment would therefore be terminated.  Martinez violated rule #4, to "[a]ct in a rude and boisterous manner," and rule #7, to "[n]ot engage in conduct which may constitute any form of discrimination, harassment, or retaliation."  (Id.)

Martinez replied angrily over the phone that "[t]he store environment had brought on these things."  (Martinez's Exhibit 16, p. 9).  She then stated that managers have made sexual remarks about female customers being "fat" and "ugly" and that "[t]he word Ghetto Ebonics is used in the store every day." (Id.).  She charged further that both Morris and Beedie had let things go and fostered that environment.  This was the first time Martinez ever raised these allegations.

2.

On August 18, 2010, Martinez sued Cracker Barrel.  On March 4, 2011, Cracker Barrel made an offer to reinstate Martinez at the same title and the same wages and benefits as she had received previously.  Martinez declined the offer.[9]  The case proceeded through discovery and Cracker Barrel then filed the instant motion for summary judgment.

D.  The Investigation of Sexually Inappropriate Remarks

After Martinez's discharge, Beedie commenced an investigation following up on

---

[9]At the hearing, counsel for Cracker Barrel indicated that Martinez responded to its offer of reinstatement with a letter from her counsel.  The letter contained a series of questions regarding the terms of her reinstatement, including what her managerial title would be, what her benefits and hours would be, whether Cracker Barrel would compensate her for the time she was off work following her termination, and whether Cracker Barrel would pay moving expenses should she be relocated.  Cracker Barrel interpreted the letter as a rejection of its offer.

Martinez's sexual harassment allegations.  It was confirmed that General Manager Longest and Associate Manager Art Sedler, both Caucasian, had engaged in inappropriate conversations or made inappropriate comments.  Specifically, Longest had admitted that he made comments concerning a guest being fat/obese or ugly and that he may have shared his personal feelings about their looks.  Similarly, Sedler admitted that he had made comments about guests being "good looking" or "having nice legs."

Although there had been complaints about both managers in the past, only one involved discrimination.  There was a prior complaint that Longest had said to a male server who was aging and limping, "With your age, I thought you'd like to be closer to the kitchen."  (Martinez's Exhibit 16, p. 5).  In an interview on February 16, 2010, Masker said that she heard both Longest and Sedler make inappropriate remarks about guests, and although she was not offended by the comments, she considered them unprofessional.  The comments were never made to the guests directly or to subordinate employees, but were limited to conversations between themselves.  In her deposition, Jones explained that this difference is significant from an HR perceptive.

After completing the investigation, Jones wrote in an email to Beedie that:  "It has been substantiated by their admission and by managers interviewed that both Don and Art have made personal comments about guest [sic] while eating or meeting at the round."  Consequently, On March 21, 2010 both Longest and Sedler received a formal "written warning" but were not discharged from their employment.

### III.  Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Telxon Corp. v. Federal Inc. Co., 309 F.3d 386, 391 (6th Cir.

2002).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." Wexler v. White's Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).  The Court will view "the evidence in the light most favorable to the nonmoving party and decide if it was sufficient to raise a genuine issue of material fact for the jury." Preferred Properties, Inc. v. Indian River Estates, Inc., 276 F.3d 790, 799 (6th Cir. 2002) (quoting EEOC v. Harbert-Yeargin, Ind., 263 F.3d 498. 510 (6th Cir. 2001)).  Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

IV.   Analysis

For analytical purposes, Michigan's Elliot-Larsen Civil Rights Act (ELCRA) resembles federal law, and same evidentiary burdens prevail as in Title VII cases. See Murray v. Thistledown Racing Club, Inc., 770 F.2d 63 (6th Cir. 1985)(applying Title VII to § 1981); Hazle v. Ford Motor Co., 464 Mich. 456, 463-64 (2001)(applying ELCRA).

A.  Prima Facie Case

1.  Direct Evidence

To defeat a motion for summary judgment on a race discrimination claim, the plaintiff must present evidence of direct or indirect evidence of discrimination.  Johnson v. Kroger Co., 319 F.3d 858, 864-65 (6th Cir. 2003).  "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful discrimination was at least a motivating factor in the employer's action." Johnson, 319 F.3d at 865 (quoting Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir.1999)).  If the fact-finder has to make an inference, the evidence is indirect or circumstantial.  Curry v. SBC Communications, Inc., 669 F. Supp.2d 805, 825 (E.D. Mich. 2009).  Direct evidence of discrimination can be shown by an explicit statement

9

which demonstrates the discriminatory intent of the decision-maker.  Id.  When a

Plaintiff presents direct evidence of unlawful discrimination, "the burden of both

production and persuasion shifts to the employer to prove that it would have terminated

the employee even if it had not been motivated by impermissible discrimination."

Johnson, 319 F.3d at 865.

Martinez provides two statements which she says are direct evidence of Cracker

Barrel's discriminatory intent.  One, when plaintiff's counsel asked Morris in deposition,

"[s]o you mean, you would agree [based on] the information you have, race was an

issue in the discharge," Morris answered, "Yes."  (Cracker Barrel's Exhibit N, pp. 87).

Defendant's counsel immediately objected on the form of the question, implying that it

was ambiguous.  Regardless, this statement does not provide direct evidence of

unlawful discrimination being "at least a motivating factor," Johnson, 319 F.3d at 865,

because it is evident from the transcript that Martinez is misconstruing what Morris

said.[10]  In fact, to clarify her statement, Morris signed an affidavit in which she states:

> To the extent that Plaintiff's counsel interprets my statements as indicating
> that Plaintiff was discharged because of her race, this is an inaccurate
> interpretation of my testimony.  Instead, I believe that racially-charged
> comments by Plaintiff may have led to her discharge.

(Cracker Barrel's Exhibit X. P. 2).  Thus, a reasonable interpretation of Morris' answer

regarding race being a factor is that it was Martinez's inappropriate racial comments

that were a factor in her termination, not Martinez's race.  Morris's affidavit does not

contradict her deposition testimony, but merely clarifies her answer.

Second, Martinez points to a statement made by Nick Beedie at deposition.

When Martinez asked if she was going to be discharged, Beedie said, "we'll both go to

bat for you,[11] but you have to remember that this is Flint and you know the history of this

store."  (Cracker Barrel's Exhibit G, p. 84).  While Martinez now speculates as to the

meaning of this statement, contending it referenced an incident where a female

---

[10]See Cracker Barrel's Exhibit N, p. 86-90.

[11]Meaning himself and Joanne Morris

Caucasian manager was fired after African-American guests complained, Beedie was never asked to explain his statement. As such, an inference is needed and an inference is indirect evidence. See Curry, 669 F. Supp. 2d at 825 ("Evidence of discrimination is not considered direct evidence unless an improper motive is explicitly addressed.")(quoting Amini v. Oberlin College, 440 F.3d 350, 359 (6th Cir.2006)).

Accordingly, Martinez cannot prevail on a direct evidence theory.

2.   Indirect Evidence

Where, as here, there is no direct evidence of racial discrimination, a plaintiff may prove a prima facie case of racial discrimination by showing that (1) she is a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was treated differently than similarly situated members outside the protected class. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

As an initial matter, there is no dispute that Martinez was qualified for her position and that she suffered an adverse employment action when she was discharged. See Curry, 669 F. Supp. 2d at 826 ("An employer's decision to discharge an employee is a classic example of an adverse employment action.")(quoting Vincent v. Brewer Co., 514 F.3d 489, 495 (6th Cir. 2007)). Thus, Martinez has established the second and third prongs of a prima facie case. Cracker Barrel, however, contends that Martinez has not established the first or fourth prongs.

In adapting the McDonnell Douglas test to cases of reverse discrimination, the Court of Appeals for the Sixth Circuit has held that, under the first prong, a plaintiff must demonstrate "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 67 (6th Cir. 1985) (quoting Parker v. Baltimore and Ohio R.R. Co., 652 F.2d 1012, 1017 (D.C. Cir. 1981)). See also Zambetti v. Cuyahoga Community College, 314 F.3d 249, 255 (6th Cir. 2002) (stating that such evidence "justifies a suspicion that incidents of capricious discrimination against whites because of their race may be likely"). To satisfy the fourth prong, a plaintiff must show that the

11

defendant treated differently employees who were similarly situated but were not members of the protected class.  Sutherland v. Mich. Dept. of Treasury, 344 F.3d 603, 614 (6th Cir. 2003).

     If a plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its decision.  McDonnell Douglas, 411 U.S. at 802.  If plaintiff creates a prima facie case of discrimination, the burden shifts to defendant to proffer a legitimate, non-discriminatory reason for plaintiff's rejection.  Id. at 804.  If the defendant does so, the plaintiff must then show that the articulated reason is a mere pretext for discrimination.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  The burden of persuasion in discrimination cases remains at all times with the plaintiff.  Burdine, 450 U.S. at 254-55.

     As to Martinez's prima facie case, she offer three pieces of evidence which she says establish "background circumstances" showing that Cracker Barrel is among the rare class of employers who discriminates against the majority.  First, Cracker Barrel was under a consent decree from the Department of Justice  based on allegations that it had discriminated based on race.  (Martinez's Exhibit 10).  The consent decree established certain processes and criteria for investigating complaints.  (Cracker Barrel's Exhibit T, p. 22-30).  Its scope was limited to complaints from African American guests and its duration was from 2004 to 2010.  Although Martinez contends that the consent decree led Cracker Barrel to "overreact", it is not relevant to the facts at issue. The consent decree governs Cracker Barrel's relationship with its guests, not the relationships between employees and managers.  Thus, the existence of the consent decree does not advance her case.  Moreover, even if the existence of the consent decree has made Cracker Barrel more sensitive to discrimination issues, that does not mean its decision regarding Martinez was motivated by her race.  In other words, that Cracker Barrel had a sensitivity toward potential discrimination in the workplace is not evidence of reverse race discrimination.

     Second, Martinez relies on the incident at the Flint store when a Caucasian

manager, Patty, called the police after her African-American guests told her that they did not intend to pay for their meal. The guests later complained to the EEOC and Patty was fired for offending them. Martinez's memory of the incident is vague and she does not provide any corroborating evidence; as such, there is no factual argument to evaluate. Thus, this incident does not show the required background circumstances.

Third, Martinez points to the comment made by Beedie that: "We'll both go to bat for you, but you have to remember that this is Flint and you know the history of this store." Once again, she fails to develop her argument. All she provides is her own speculation of what Beedie may have meant.

Overall, Martinez has not shown that Cracker Barrel had a predisposition to discriminate with regard to the narrow issue of the conduct between managers and their employees. As such, she has not established the first prong of her prima facie case sufficient to survive summary judgment.

As to the fourth prong, Martinez must show that a similarly situated African-American employee received more favorable treatment. Martinez identifies Tara Guidry as similarly situated. She makes two assertions: (1) Guidry's complaint about general manager Brian Montclam was taken more seriously by Cracker Barrel than the complaints of Martinez and other employees; and (2) Guidry used inappropriate language, such as "ghetto card" and was not disciplined. Each assertion will be addressed in turn.

With regard to the Montclam complaint, Martinez conceded that she never called the hotline or wrote a statement about Montclam as the company policy requires. (Cracker Barrel's Exhibit G, pp. 29-30). As such, her complaint might have failed because it was improperly rendered rather than because of discriminatory motives. Moreover, there is no evidence that Guidry was actually the catalyst for Montclam's leaving. In fact, Martinez states in her deposition that the investigation revealed that Montclam allowed people to "work off the clock" and had some food cost issues. (Id. at p. 28). Finally, Guidry declares in an affidavit that she never made a complaint about

Montclam.  (Cracker Barrels' Exhibit R, p. 2).

Regarding her second assertion, the evidence is conflicting on whether Guidry used the term "ghetto card."  Martinez says that Guidry has used this term  (Cracker Barrel's Exhibit G, p. 74, 82).  Guidry, however, said in an interview that she never used this term.  (Cracker Barrel's Exhibit M, p. 42).  Further, Guidry declares in her affidavit that she learned during her training that the term ghetto was offensive and she counseled Martinez on one occasion that the term was inappropriate.  (Cracker Barrel's Exhibit R, p. 2).  Finally, Jones testified that she undertook an investigation to determine whether Guidry had indeed used the tem "ghetto card" but concluded that "it wasn't substantiated that she actually used the term."  (Cracker Barrel's Exhibit T, p. 79).  Jones added that Guidry has mentioned in her interview that in her mind, "ghetto" meant "hood" but there is no evidence that she actually used the term "hood" in the workplace.

Martinez additionally contends that Guidry's manner was unprofessional, she discussed openly her ability to take sick leave at a whim, and she used the term "peep my swag."  However, Martinez never made a formal complaint about Guidry as the company policy requires.  She recalls only making two comments to Morris, one before her investigation commenced and one during her own investigation.  She recalls the conversations as follows:

> When Joanne (Morris) would visit, she would always ask how things were going in the store and how managers were doing, and I brought to her attention the way Tara (Guidry) acts, the way she walks around the store talking about the way she can get a medical release, her mannerisms, those kinds of things.  And Joanne response to me was that I'm sure Nick (Beedie) knows about it.  And one time - the one Sunday when I sat at a table in smoking with Nick and Joanne, Nick got up at one point and I was telling her about things that Tara does and she said I know, other managers have complained to Nick, I'm sure he's taking care of it.

(Cracker Barrel's Exhibit G, p. 34).

In sum, there is not evidence to create a genuine issue of material fact as to whether Guidry was treated differently than Martinez.  Even if Guidry acted inappropriately by using the word "ghetto," "hood" or the expression "peep my swag," her misconduct was not as pervasive as that of Martinez.  Moreover, Guidry was an

assistant manager and Martinez was a retail manager.  In terms of the company
hierarchy, Martinez is one management level above Guidry and was held to a slightly
higher standard.  Thus, they are not identically situated.  See Curry, 669 F. Supp. 2d at
826 ("To satisfy the similarly-situated requirement, a plaintiff must demonstrate that the
comparable employee is similar in all relevant aspects.").

As Martinez is unable to satisfy the first and last element of the McDonnell Douglas
test, her prima facie case of reverse race discrimination fails.

### B.  Pretext

Even assuming Martinez has made out a prima facie case, she must show that
Cracker Barrel's actions were pretextual.  To raise an issue of fact as to pretext, a
plaintiff must show one of the following:  "(1) That the proffered reasons had no basis in
fact, (2) that the proffered reasons did not actually motivate the action, or (3) that the
proffered reasons  were insufficient to motivate the action."  Cicero v. Borg-Warner
Automotive, Inc., 280 F.3d 579, 589 (6th Cir. 2002).  Under the first and third method, a
fact-finder may infer discrimination from the circumstances. Id.  Under the second
method, the plaintiff may not provide the same evidence used to advance the prima
facie case but must introduce additional evidence of discrimination. Id.

Martinez contends that Cracker Barrel reformulated the rationale for her
discharge several times and thereby demonstrated that it had no basis in fact for
discharging her.  See Cicero, 280 F.3d at 592 ("An employer's changing rationale for
making an adverse employment decision can be evidence of pretext.")(quoting Thurman
v. Yellow Freight System., 90 F.3d 1160, 1167 (6th Cir.1996)).  Martinez, however, has
failed to show that Cracker Barrel changed its rationale for her termination; rather, the
different rationales are the result of different company procedures.  The record reveals
that there are several stages in a termination proceeding.  At each stage there are
specific procedures that must be followed.  Consequently, the forms at each stage are
not uniform.

At an initial step in the termination procedure, Jones made a recommendation

which listed five reasons for Martinez's termination:  (1) inappropriate comments regarding Haiti; (2) discussions about teen pregnancy and lifestyle choices; (3) use of the term "ghetto"; (4) sharing her own personal viewpoint on teen pregnancy; and (5) inappropriate conversation of a personal matter with employees.  (Cracker Barrel's Exhibit T, p. 58).

Subsequently, when the recommendation for termination was confirmed, Jones had to enter a termination code in her computer.  The system only allows one code; as such, Jones used the termination code 44 which is "rude and boisterous behavior," making reference to the Haiti discussion.  Finally, Morris prepared the official discharge form, the "Employee Counseling Form," which summarizes the reasons for the termination.  Martinez's form lists the violation of two rules: Rule 4, "act in a rude and boisterous manner"; and rule 7, "not engage in conduct which may constitute any form of discrimination, harassment, or retaliation." (Cracker Barrel's Exhibit N).  It is self-evident that rule 4 corresponds to code 44 and to (1) of the five reasons listed in Jones' recommendation and rule 7 corresponds to (2)-(5) of the five reasons listed in Jones' recommendation.  While it may have been simpler for Cracker Barrel to use a uniform code or set of rules across all stages of the investigation, its failure to do so does not imply that Cracker Barrel was uncertain as to why it discharged Martinez.

Under the third method, Martinez contends that Cracker Barrel's proffered reasons were not sufficient to motivate her termination.  For instance, Cracker Barrel claimed that she had acted unprofessionally and violated the rules, yet managers Longest and Sedler made comments which were discriminatory toward age and gender, but only received a warning.  Martinez claims that their lesser punishment is proof of disparate treatment.  Additionally, Martinez contends that other employees (African-Americans) used the term "ghetto card" among each other, yet they were only given policy reviews \but were not discharged.  In sum, Martinez concludes that  "[w]ithout race being a factor, Cracker Barrel's reason does not seem sufficient to terminate an

16

excellent long-term employee."

Martinez's first argument fails on the merits.  Her contention that there is a similarity between herself and Longest and Sedler, and therefore the failure to treat all violations alike is proof of a pretext for discrimination, presupposes that they are substantially similar.  The Sixth Circuit, however, allows an employer to apply different rules differently.  See Curry, 669 F. Supp. 2d at 827 ("[A]n employer may choose to treat different rule violations more or less severely without the employees being considered 'similarly situated'").  The Sixth Circuit explains that when it evaluates similarly-situated employees, its role is to determine whether unlawful motives guided the employer's decisions, not to "evaluate the employer's business judgment." Ladd v. Grand Trunk W.  R.R., 552 F.3d 495, 503 (6th Cir. 2009).  As such, Cracker Barrel's decision to discipline racial slurs more severely than age or gender slurs does not constitute proof of discrimination.  Additionally, Longest and Sedler made inappropriate comments to each other whereas Martinez made inappropriate comments to her subordinates.  Jones says that this is a significant difference from an HR perceptive. (Cracker Barrel's Exhibit T, p. 105).

Martinez's second argument fails on the same grounds – the two entities were not similarly situated.  Indeed, Martinez received a harsher punishment than the employees but the difference in treatment was not linked to race; rather, it was linked to differences in job description.  Martinez was a manager and managers are held to a higher standard.  (Cracker Barrel's Exhibit T, p. 104).

In sum, there is no evidence that Cracker Barrel's reason for termination - Martinez's violation of company rules - was a pretext for discrimination.  Upon receiving a complainant about Martinez, pursuant to company policy, Cracker Barrel initiated an investigation.  It conducted  a series of interviews and collected statements.  The investigation revealed a series of inappropriate conversation and a pattern of offensive comments.  It revealed that Martinez had violated a number of company policies and

had created tension between herself and her subordinates.  Upon completion of the investigation there was a recommendation to discharge Martinez.  Martinez has failed to meet her summary judgment burden to show that her termination was a result of her race.

IV.  Conclusion

Based on the above, Cracker Barrel's motion for summary judgment is GRANTED.  The case is DISMISSED.

SO ORDERED.


       S/Avern Cohn
       AVERN COHN
       UNITED STATES DISTRICT JUDGE

Dated:  August 29, 2011


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, August 29, 2011, by electronic and/or ordinary mail.

       S/Julie Owens
       Case Manager, (313) 234-5160